Filed 3/30/20; Modified and Certified for Pub. 4/23/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | B300214 (Los Angeles County Super. Ct. No. 19CCJP02321) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JUSTIN R., Defendant and Appellant. | |

APPEAL from a dispositional order of the Superior Court of Los Angeles County, Philip L. Soto, Judge. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and O. Raquel Ramirez, Deputy County Counsel, for Plaintiff and Respondent.

_____

The Los Angeles County Department of Children and Family Services (DCFS) initiated juvenile dependency proceedings concerning ten-year-old S.R. based on her father's (Justin R.'s) possession of child pornography in the child's home. The evidence presented below shows that several of the images Justin R. possessed depicted young females around S.R.'s age engaged in various sexual acts, and that one of the images may have depicted a father having sexual relations with his prepubescent daughter. After the juvenile dependency proceedings began, Justin R. suffered a felony conviction arising from his possession of the child pornography. The juvenile court later sustained the dependency petition's jurisdictional allegations against Justin R., removed S.R. from his physical custody, and authorized Justin R. to have monitored visits with S.R.

Although Justin R. does not challenge the juvenile court's assertion of jurisdiction on appeal, he does contest the dispositional ruling removing S.R. from his custody.[1]

_____

[1] In the opening brief, Justin R.'s appellate counsel questioned the propriety of the juvenile court's assertion of jurisdiction, "but believe[d] that [his trial counsel's] concession forfeited any jurisdictional argument on appeal." In his reply, however, Justin R.'s appellate counsel clarified that the attorney "did not contest jurisdiction" in the opening brief, but counsel "is more than happy to submit supplemental briefing on the issue of jurisdiction if this [c]ourt deems the issue not forfeited and so

Specifically, he argues that his mere possession of child pornography does not demonstrate that he poses a substantial risk of harm to his daughter.

We disagree. The Supreme Court has held that " 'even . . . a low degree of probability' " can give rise to a substantial risk if " 'the magnitude of the harm is potentially great.' " (See *In re I.J.* (2013) 56 Cal.4th 766, 778 (*I.J.*).) Here, viewing the record in the light most favorable to the dispositional order (as we must), we conclude there is substantial evidence of risk of great harm to S.R.—no matter how low the probability— that Justin R. will sexually abuse his daughter if he is provided unfettered access to her. Accordingly, we affirm the juvenile court's dispositional order.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts that are relevant to the instant appeal.

---

desires." Because Justin R. has failed to raise properly any jurisdictional challenge or defense to forfeiture, we need not address these issues further. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error.' [Citations.] ' "Appellate briefs must provide argument and legal authority for the positions taken." [Citation.] "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived," ' " first bracketed insertion added].)

### 1. The initial dependency petition, its supporting documents, and the detention hearing

On April 12, 2019, DCFS filed a juvenile dependency petition concerning ten-year-old S.R. The petition alleged that jurisdiction was proper under Welfare and Institutions Code section 300, subdivisions (b)(1) and (d),[2] and asserted two counts against Justin R. Counts b-1 and d-1 of the petition each alleged the following: "[S.R.'s] father, Justin R[.], created a detrimental and endangering home environment for the child in that the father possessed child pornography on an external hard drive, in the child's home, within access of the child. Such a detrimental and endangering home environment established for the child by the father endangers the child's physical health, safety and well-being and places the child at risk of serious physical harm, damage, danger and sexual abuse." S.R.'s mother (mother) was not named as an offending parent under the petition.

On April 12, 2019, DCFS also filed a detention report and an addendum report.

---

[2] Undesignated statutory citations are to the Welfare and Institutions Code. Section 300, subdivision (b)(1) provides in pertinent part that juvenile dependency jurisdiction is proper if: "The child has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).) Subdivision (d) provides in relevant part that jurisdiction is proper if: "The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household . . . ." (§ 300, subd. (d).)

The detention report asserts that on April 10, 2019, police arrested Justin R. at his, mother's, and S.R.'s family home after Justin R. admitted to officers that certain child pornography found on a computer had belonged to him.[3]  Later that day, DCFS interviewed mother, S.R., and Justin R.

Mother stated that she and Justin R. have been married for 12 years and S.R. is their only child.  Mother reported she and Justin R. "are together only for [S.R.]"; she claimed that Justin R. sleeps on the couch downstairs and the two of them "no longer share a sexual relationship because he is impotent."  Mother expressed her concern that Justin R. is the family's only source of income because she does not work.  Nonetheless, she insisted that Justin R. "will not be coming back to her home, even if he [is] bail[ed] out of jail."  She "denied any concerns . . . . that [Justin R.] has sexually abused [S.R.]."  Mother also "denied having any knowledge of what [Justin R.] was searching [for] on his computer."

During her interview with DCFS, S.R. "denied all types of abuse and neglect."  In addition, she "denied [that anyone had] sexually abus[ed] her, or show[ed] her nude photographs of others, expos[ed] themselves to her, or t[ook] nude/explicit photographs of herself."  "[S.R.] stated that if this were to happen[,] she would tell . . . mother or [Justin R.]"

Justin R. told DCFS that "he never admitted to [law enforcement] that he watches child porn[ography] and had child porn[ography] on his electronics."  He stated he watched pornography "once every day," but claimed that he " 'watch[es]

---

[3] The remainder of this paragraph and the following four paragraphs summarize pertinent aspects of the detention report.

regular porn.' " Justin R. represented that, "when he watches porn[ography] he is away from everyone else[;] . . . . [he] stated he usually watches porn when everyone is sleeping" and "he would never watch porn on [S.R.'s] electronic devices." "[He] gave [DCFS] verbal consent to detain the child from [him]" and "agreed not to return to the home."

Shortly after DCFS interviewed Justin R., mother reported to DCFS that she and Justin R.'s sister intended to bail Justin R. out of jail. Mother told DCFS that Justin R. was "going to get all of his belongings and move in with [his sister]."

In the addendum report, DCFS recommended that S.R. remain in mother's home, and that Justin R. receive monitored visits with the child. DCFS also reported that "[Justin R.] was released from jail on bond on 04/10/2019."

On April 15, 2019, the juvenile court held a detention hearing. At the hearing, Justin R. entered a general denial to the petition. The juvenile court found a prima facie case for detaining S.R. from Justin R., and ordered that S.R. be released to mother and receive monitored visits from Justin R. Additionally, the juvenile court barred Justin R. from living in mother's and S.R.'s home.

### 2.    *The jurisdiction/disposition report*

On May 9, 2019, DCFS filed a jurisdiction/disposition report. The report states that the police seized two devices from the family's home: a laptop computer and an external hard drive. Mother and Justin R. each told DCFS that S.R. did not have access to either of these devices. Also, "mother reported that she does not plan on obtaining a divorce from [Justin R., and] indicated that she would like to resume their living arrangement while [Justin R.] receives treatment/services."

### 3.   *The first amended petition*

On May 17, 2019, DCFS filed the first amended petition. The pleading amended counts b-1 and d-1 to allege that Justin R. possessed child pornography on not only an external hard drive, but also on a laptop computer.  Specifically, each count avers: "[S.R.']s father, Justin R[.], created a detrimental and endangering home environment for the child in that the father possessed child pornography on an external hard drive and laptop computer, in the child's home, within access of the child. Such a detrimental and endangering home environment established for the child by the father endangers the child's physical health, safety and well-being and places the child at risk of serious physical harm, damage, danger and sexual abuse." The first amended petition did not otherwise differ from the original petition in any material respect.

On May 20, 2019, Justin R. entered a denial to the first amended petition.[4]

### 4.   *The police reports*

On June 4, 2019, DCFS filed a last minute information, along with certain police reports, including (inter alia) an arrest report, a follow-up investigation report, and a forensic examination report.

---

[4]  The record indicates that mother entered a denial to the first amended petition as well, even though it does not name her as an offending parent.  In any event, mother is not a party to this appeal.

According to the arrest report, Tumblr[5] reported to the National Center for Missing and Exploited Children (NCMEC) that in November 2018, one of Tumblr's users utilized its server to upload certain videos depicting child pornography; the NCMEC forwarded that report to the Los Angeles Police Department (LAPD).[6] One of the videos shows a nude girl, approximately seven years of age, lying on a bed; kneeling in front of her is a nude adult male who rubs his erect penis on the young girl's vagina and begins to ejaculate on her stomach. The second video shows a young child lying face down on a bed as an adult male "ha[s] intercourse with or sodomize[s] the child from behind" and the child moans and cries. The LAPD's investigation revealed that the Internet Protocol Address associated with the user who uploaded the videos belonged to Justin R.

On April 10, 2019, the LAPD executed a search warrant at Justin R.'s residence. During the search, the LAPD retrieved a laptop computer and an external hard drive; Justin R. admitted that both of those devices belonged to him. The LAPD arrested Justin R. and seized the laptop and the hard drive.

The follow-up investigation report indicates that the seized external hard drive contained images showing female children under 12 years of age posing nude and engaging in various sexual acts with adults. According to the follow-up report, Justin R. told

[5] According to the comprehensive psychological and risk assessment report discussed *post*, Tumblr is "a microblogging and social network website which allows users to post multimedia and other content to a short form blog."

[6] The remainder of this paragraph and the following paragraph summarize certain relevant contents of the arrest report.

8

LAPD officers on April 10, 2019 that he has never had a Tumblr account and that "[o]utside of his prior employment with the Los Angeles County Police, . . . he has not seen [c]hild [p]ornography."

The forensic examination report states that police ultimately found "approximately six hundred fourteen images and fifty-four videos of [c]hild [p]ornography" on Justin R.'s external hard drive.  Furthermore, the report indicates that "[o]ver one thousand downloads between the dates of May[ ] 2010 through March[ ] 2014 were discovered on" the external hard drive, the "majority" of which had "file names indicative of [child pornography]," including " 'Pthc animal sex young girl dog remastered' " and " 'pedo-11 yo girl fucked dad.' "  The report further claims that "[a]pproximately one hundred ninety-two images of [child pornography] were recovered from" the laptop computer police had seized.

### 5.    *Dr. Crespo's opinion letter*

On June 4, 2019, DCFS filed a last minute information report, to which a May 31, 2019 opinion letter from Alfredo E. Crespo, Ph.D. was attached.  Dr. Crespo reviewed the detention report, the jurisdiction/disposition report, and an article titled "The 'Butner Study' Redux:  A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders" (Butner Study) for the purposes of ascertaining whether Justin R. "presents a 'substantial risk of harm' " to S.R.  Dr. Crespo prefaced the letter with the following caveat:  "This assignment was accepted with the proviso that any opinions expressed should be considered limited by the absence of psychological evaluations of the minor and her parents."

"In [Dr. Crespo's] opinion, the present review of documents in the present matter suggests that the [c]ourt should find that

9

[Justin R.] may, more likely than not, pose a risk of a substantial harm to his own daughter. An active sexual interest in children reflected in the possession of child pornography is rarely, at least among convicted offenders, limited to *only* viewing such pornography." The doctor noted that the Butner Study indicated there is a "high incidence of 'hands-on' child sexual abuse among men convicted only of possession of child pornography."

Dr. Crespo further opined: "Even if [Justin R.] is ultimately determined to be among the rare convicted owners of 'just pictures' who do not sexually abuse children, or [i]f the findings of the [Butner] [S]tudy . . . [are] seen as irrelevant because the subjects did not include incest offenders, [Justin R.] poses a risk of emotional abuse inherent in the sexualized climate that inappropriate sexual fantasies regarding children created . . . ."

### 6.	Dr. Malinek's comprehensive psychological and risk assessment report

On August 15, 2019, Justin R. filed a comprehensive psychological and risk assessment report dated July 23, 2019, which was prepared by Dr. Hy Malinek, PsyD, a licensed psychologist. Dr. Malinek interviewed and tested Justin R. for approximately four hours on May 3, 2019, at which time Dr. Malinek "conducted a mental status examination, obtained relevant psychosocial and psychosexual history and administered two personality tests." "In assessing the risk that [Justin R.] would reoffend, [Dr. Malinek] scored the Child Pornography Offender Risk Tool (CPORT), a relatively new actuarial (statistical) measure for the assessment of recidivism among child pornography offenders," and "consulted the latest research on child pornography offenders." Dr. Malinek also reviewed

10

certain documents relating to Justin R.'s criminal proceedings (e.g., the arrest and follow-up investigation reports and Justin R.'s "computerized rap sheet"), along with progress reports from two therapists who had seen Justin R. (i.e., Lisa Richards and Lisa Howe). Additionally, Dr. Malinek interviewed a foster mother who had cared for Justin R. from the age of eight and a half to the age of eighteen.

Justin R. reported to Dr. Malinek that he lived in foster homes from the age of three until he reached the age of majority. Justin R. stated that after reaching adulthood, he served as an officer in the National Guard and had "participated in combat" in Iraq in 2004 and 2005. When Dr. Malinek asked Justin R. "about the emotional impact of his military service and exposure to combat and loss of life," Justin R. responded, " 'I was so busy I did not think about my emotions.' "

"[Justin R.] readily acknowledged that after his marriage 'went down' he began looking for pornography" on the Internet. "He stated that he has never acquired a file sharing program, however, and believes that child pornography 'slipped in there with the shock stuff by accident[,]'[ ] or while he was in a chat room." Justin R. admitted to viewing pornography on Tumblr "and often clicking on 'random categories or some pages where there was child pornography.' " "He acknowledged that there may have been images of prepubescent children in his possession." Justin R. insisted, " 'If there was any distribution on my end, it was accidental. I'm not into children. I would do things for shock, and would look for the adrenaline rush online.' "[7]

---

[7] Yet, the report indicates that Richards told Dr. Malinek that "[Justin R.] described himself as 'compartmentalizing' different facets of his life and acknowledged an extreme addiction

11

Dr. Malinek opined that: "It certainly appears that [Justin R.'s] habit of watching pornography drew quite a bit from habituation to mainstream pornography, frustrated needs for intimacy, sexual preoccupations and long-term marital problems. In all likelihood, [Justin R.] has looked to sexual fantasy and 'extreme' images online in an effort to sooth [*sic*] himself, and distance himself from feelings of anger or inadequacy he had trouble articulating, recognizing or confronting." The doctor diagnosed Justin R. with post-traumatic stress disorder and adjustment disorder with anxiety and depression.

Dr. Malinek further opined, "[Justin R.] is certainly a 'fantasy driven' and not a 'contact driven' offender." "The first group [of possessors of child pornography (i.e., fantasy-driven offenders)] essentially involves individuals who look for child pornography for the purpose of sexual gratification and masturbation whereas the second [group of possessors [(i.e., contact-driven offenders)] is more driven by a wish to have 'hands-on' contact with an individual."[8] Dr. Malinek noted that certain studies indicate that " 'hands-off ' offenders do not inevitably hold dysfunctional attitudes and beliefs related to sexual contact with adults and children that have been found to be criminogenic."

Dr. Malinek concluded that Justin R. "obtained a score of 1 on the CPO[R]T" (on a scale of 0 to 7) and had an "expected recidivism rate" of "five percent in five years." (Boldface omitted.)

---

to pornography, *which eventually involved being sexually aroused by images of minor children*." (Italics added.)

[8] Dr. Malinek further claimed that, "[w]hile it may sound 'counter[-i]ntuitive,' studies have repeatedly shown that the vast majority of [child] pornography possessors do not go on to commit 'hands on' sexual contact with children."

Dr. Malinek claimed that this score "does not designate [Justin R.] as a high-risk offender." The doctor nonetheless conceded that "[t]ranslating the CPORT scores to risk level[s] is quite difficult" because the model does not "yet have a large enough sample size for reliable recidivism estimates" and "there is an insufficient range of scores to meaningfully distinguish risk levels."

Dr. Malinek also found that his "[a]nalysis of research supported risk factors associated with recidivism among child pornography offenders denotes a low risk."[9] Dr. Malinek noted that Justin R.'s "prior criminal history is minimal, . . . he has no history of sexual misconduct, and . . . he has never attempted any 'hands on' contact with a child." The doctor observed: "[Justin R.] does not impress me or test as narcissistic, exploitative, psychopathic or prone to violence. Many of the criminological risk factors which have been associated with repeat offenses are absent in this case (for example, substance abuse, negative peer group, high psychopathy)." Dr. Malinek further claimed that Justin R. "has taken responsibility for his conduct and has been involved in psychotherapy where he is described as engaged and motivated." The expert also "doubt[ed] that [Justin R.] is pedophiliclly [sic] inclined and note[d] that he has maintain[ed] sexual interest and involvement with adults."

---

[9] Dr. Malinek explained that the CPORT model considers certain "items" to "be most predictive of recidivism among child pornography collectors," including: "age below 35, any prior criminal history, any prior contact sexual offense history, any conditional release failures, admission of pedophillic [sic] [or] hebephillic [sic] sexual interests, and a large proportion of males (versus females) in child pornography."

13

Dr. Malinek acknowledged Justin R. "*has a way to go* in developing some insight about his coping mechanisms, in working through some of his earlier trauma, in understanding the reason he has turned to and became addicted to pornography in the first place, and in developing satisfying intimate relationships." (Italics added.) He further opined, "[s]hould [Justin R.] continue to receive treatment and *be tightly monitored*, the likelihood that he would recidivate would probably decrease even further." (Italics added.) Indeed, the expert explicitly recommended that Justin R. undergo "tight monitoring and individual psychotherapy, as well as [have] sex offender treatment continue for the foreseeable future." Dr. Malinek "hope[d] [Justin R.] will utilize treatment to get in touch with the feelings and experiences that have led him to possess and distribute child pornography, work through some of the traumas associated with his earlier family history and war experiences, and . . . develop and solidify healthy and appropriate relationships as well as safeguards against recidivism."

### 7. *The August 15, 2019 adjudication and disposition hearing*

On August 15, 2019, the juvenile court held an adjudication and disposition hearing at which Dr. Crespo and Dr. Malinek offered their testimony. The juvenile court also admitted into evidence certain documents, including the detention report and its attachments, the jurisdiction/disposition report and its attachments, the police reports DCFS previously filed, Dr. Crespo's opinion letter and the Butner Study,[10] Dr. Malinek's

---

[10] Justin R. asked the juvenile court to strike Dr. Crespo's opinion letter, the Butner Study, and Dr. Crespo's testimony. Specifically, Justin R. argued that this evidence lacked

14

comprehensive psychological and risk assessment report, a declaration and a progress report authored by Howe, and an August 5, 2019 minute order from Justin R.'s criminal proceedings (along with several other minute orders issued during those proceedings).

The August 5, 2019 minute order from Justin R.'s criminal case shows that on that date, Justin R. pleaded nolo contendere to one count of violating Penal Code section 311.11, subdivision (c)(1), and the criminal court dismissed another count that charged Justin R. with violating Penal Code section 311.1, subdivision (a) pursuant to a plea negotiation. The criminal court found that "there [was] a factual basis for [Justin R.'s] plea, and . . . accept[ed] [the] plea." Among other things, the criminal court suspended the imposition of Justin R.'s sentence, placed Justin R. on probation for a period of five years, ordered Justin R. to participate in "52[-]week sex offender counseling" and "weekly individual counseling for one year," and required Justin R. to register as a convicted sex offender. The criminal court also prohibited Justin R. from having "contact with minors except for his own children" and from "own[ing], us[ing], or possess[ing] any pornography."

The remainder of this section summarizes certain pertinent aspects of the adjudication and disposition hearing.

---

foundation and that Dr. Crespo "lacked the skill[,] knowledge and training required under the Evidence Code to formulate such an opinion" regarding the risk of Justin R. sexually abusing S.R. The juvenile court denied Justin R.'s oral motion to strike and admitted these two documents and Dr. Crespo's testimony into evidence.

### A. Dr. Crespo's Testimony

Justin R. called Dr. Crespo to the stand in order to cross-examine him. Dr. Crespo testified that although he had "over 30 years of experience in doing risk assessments for the courts," he could "recall about no more than five [child pornography possession] cases in which [he] was the evaluator," and that he handled those five cases in his private practice. Dr. Crespo explained that the instant adjudication and disposition hearing was the first occasion on which he offered testimony regarding individuals possessing child pornography.

Dr. Crespo admitted that the Butner Study was the only "research with regard to assessment of risk for individuals convicted of possessing child pornography" that he had reviewed in forming his opinions for this case. He acknowledged that "whether an individual convicted of possessing child pornography would re-offend with a hands-on sexual offense after release from incarceration" was "not the focus" of the Butner Study. He also admitted that the study did not specify whether its subjects had committed any sex offenses against family members.

In addition, Dr. Crespo testified that he reviewed Dr. Malinek's report after he prepared the opinion letter. Dr. Crespo stated that he had heard of the "child pornography offender risk tool" referenced in Dr. Malinek's report, but he did not utilize that tool because he "did not evaluate the parties directly."

On redirect examination, Dr. Crespo testified that he agreed with Dr. Malinek's recommendation that Justin R. be subject to tight monitoring and individual psychotherapy.

## B.     Dr. Malinek's Testimony

Dr. Malinek testified that he is a clinical and forensic psychologist who has evaluated sexual abuse perpetrators "[a]pproximately 2,000 times during the last 20 years." He stated he is "considered an expert on risk assessment of sexual misconduct." He claimed to have testified "about 350 times to 400 times," and he indicated that he has testified in juvenile court "between 15 and 20 times during the last 20 years."

Dr. Malinek testified that Justin R.'s "low [CPORT] score [(i.e., his CPORT score of one)]. . . . put him in a group of people where the vast majority, 95 or 96 [percent], do not re-offend." He asserted that Justin R. does not have any of the seven "CPORT risk factors." Although Dr. Malinek acknowledged that it is "not yet possible to establish a risk level [via the CPORT model] because of small sample size" and "there is an insufficient range of scores to meaningfully distinguish risk levels," he opined that Justin R. "has a low score anyway you look at it." The doctor further opined that Justin R. was not "a risk to his daughter."

Dr. Malinek criticized the Butner Study. He testified that the study "was initially not peer reviewed." He further claimed that "many" of the participants in the study, who were inmates in a sex offender treatment program housed in a federal correctional institution, "reported they felt pressured to come up with long lists of victims," which "exaggerated [the] number of reported sexual offenses." Dr. Malinek also asserted that "there's never been a study that replicated these figures of 85 percent of child pornography offenders committing hands-on offenses," and that "multiple other studies that are current . . . have shown that the recidivism of child pornography offenders is in the single digits."

17

Dr. Malinek also testified there are "multiple comments by the most prominent authorities in the field . . . that show . . . that in the vast majority of cases, child pornography alone, in the absence of [a] criminal history of violence, is not a predictor of risk." He insisted that "the vast majority of individuals who are possessing child pornography and do not have other criminal histories[ ] are not likely to target a child for a hands-on offense, not cross to molesting children."[11]

When asked why he had recommended that "there be[ ] [tight] monitoring of" Justin R., Dr. Malinek appeared to claim that he made this recommendation simply because he "thought psychiatric intervention was necessary" to address Justin R.'s depression and anxiety. For instance, Dr. Malinek stated: "[S]o I certainly believe that [Justin R.] should receive or continue to receive emotional help or psychotherapy, but it did not change my opinion about the harm to his kid or the prospect of he would be [*sic*] dangerous to her."

Dr. Malinek recommended that Justin R. complete a full year of counseling and a "52-week sex abuse for perpetrator's program," and acknowledged that Justin R. had not yet done so. Yet, the doctor suggested he believed that Justin R. did not need to undergo such treatment in order to prevent him from harming S.R. In particular, although Dr. Malinek admitted that treatment would "manage the risk" that Justin R. would "re-offend[ ]," the doctor reiterated his opinion he "do[es] not

---

[11] Similarly, Dr. Malinek later testified, "I believe that the take-home point from these studies is that the idea that if you have a child pornography offense, you also are going to commit a hands-on offense has not been verified. It's not been found to be true."

believe that [Justin R.] would commit a hands-on offense especially now and with everything that has happened." The doctor, however, agreed that "the chances of [Justin R.] reoffending would be lower if he goes through a full course of treatment."

Toward the end of Dr. Malinek's testimony, the juvenile court asked him the following question: "This is what I'm not understanding about the methodology for these studies that you're making reference to about recidivism for child pornography. When we say the words, 'recidivism,' do we mean just looking at . . . child pornography again, or do we mean something more than that?"

Dr. Malinek then provided the following equivocal response: "Studies have looked at various forms of recidivism. Some looked at the likelihood that someone will get in trouble with the law which was a larger likelihood in some cases. Specific studies looked at whether the person is likely to commit a new child pornography offense. And others looked at whether they are likely to commit a new hands-on sexual offense given their history of prior conviction. [¶] It all depends, your honor, in what the person, where he falls, what he comes into this with, whether he has additional risk factors that are associated with recidivism."

Dr. Malinek also testified that the studies he relied upon "have not looked at or did not provide information about how many [subjects] completed rehabilitation." He stated that "it's hard to quantify" rehabilitation in these studies because the definition of that term "varies" in different jurisdictions. The doctor testified that, "In some counties or states it's 52 sessions[,

19

i]n other cases, it's individual therapy[, and] in some cases, it could be a hospital stay."

### C. The Juvenile Court's Rulings

Before the juvenile court rendered its decision, Justin R.'s counsel made the following concession: "I think that there is sufficient risk for the court to take jurisdiction." The attorney maintained, however, he did not "believe that there is clear and convincing evidence to support a removal." S.R. and DCFS countered, inter alia, that Justin R.'s conviction for possession of child pornography gave rise to a presumption under section 355.1, subdivision (d) that S.R. "is at substantial risk of abuse."[12]

Thereafter, the juvenile court sustained counts b-1 and d-1 of the first amended petition against Justin R.; declared S.R. "a person described by [section] 300, subdivision[s][ ] (b)[ ] [and] (d)"; found that "pursuant to [section] 361[, subdivision] (c), continuance in the home of [Justin R.] is contrary to the child's

---

[12] The reporter's transcript indicates that S.R.'s counsel discussed a presumption that purportedly arose under section 355.1, subdivision (b). This appears to be a typographical error because section 355.1, subdivision (b) does not contain an evidentiary presumption. (Compare § 355.1, subd. (b) ["Proof that either parent, the guardian, or other person who has the care or custody of a minor who is the subject of a petition filed under Section 300 has physically abused, neglected, or cruelly treated another minor shall be admissible in evidence"], with § 355.1, subd. (d) [providing that under certain circumstances, there is a "presumption" that "the subject minor is a person described by subdivision (a), (b), (c), or (d) of Section 300 and is at substantial risk of abuse or neglect"].)

welfare" and "[t]here's no reasonable means to keep the child safe without removal"; and "removed [S.R.] from [Justin R.] and released [S.R.] to mother."

The juvenile court reasoned that Justin R.'s conviction, the order requiring him to complete a 52-week sex abuse program, and the other conditions imposed pursuant to his sentence (e.g., Justin R. may not have contact with children except for his own) amount to "clear and convincing evidence that [Justin R. is] a risk to all children." The court also remarked that it was "not sure whether or not [Dr.] Malinek's statistical analysis is the right direction or Dr. Crespo's," the "CPORT program is of very little weight given that it has such a small sample size," Dr. Malinek does not know "what [Justin R.] will do in the future" because he "has no crystal ball," and the court was "not accepting the assertions from Dr. Malinek that [Justin R.] did this not because [he] enjoy[s] or get[s] a thrill out of looking at child pornography, but . . . [was] just reacting to other stressors in [his] life." With regard to that last point, the juvenile court stated that it did not "see [child porn] as being therapeutic," and Justin R. does not need to "watch child porn in order to relax."

Additionally, the juvenile court explicitly found that "[Justin R.] is an extreme risk to the child, because even though the likelihood that he will do something to her physically . . . may be small, the risk of harm is great." The court further elaborated, "Putting [S.R.] at risk of possibly being involved in child pornography or some other hands-on sexual abuse is a great, great danger to the child and would do her extreme harm." The juvenile court also stated: "[K]eeping [Justin R.] away from [his] child will eliminate the risk of any future harm to the child at least until [he has] been ret[r]ained, and we have reason to

21

believe that because of retraining there's a very small likelihood that [he] will do this again."

The juvenile court authorized Justin R. to have visits monitored by a DCFS-approved monitor in a setting approved by the agency. The court barred Justin R. from having visits at mother's home and prohibited mother from serving as the monitor for Justin R.'s visits. It also ordered Justin R. to undergo sex abuse counseling for perpetrators.

On August 21, 2019, Justin R. appealed the juvenile court's dispositional order.

## DISCUSSION

Section 361, subdivision (c) is a "limit on the court's authority to restrict a parent's rights following the exercise of dependency jurisdiction." (See *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 347.) The provision states in pertinent part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances[:] . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . . [¶] (4) The minor . . . has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of

22

sexual abuse without removing the minor from his or her parent . . . ."  (See § 361, subds. (c)(1) & (c)(4).)

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*I.J.*, *supra*, 56 Cal.4th at p. 773; see also *In re Quentin* (2014) 230 Cal.App.4th 608, 615, fn. 6 (*Quentin*) ["Ordinarily, we review the juvenile court's jurisdiction findings and disposition orders for substantial evidence"].)

Justin R. argues that "[t]he juvenile court erred when it removed [S.R.] from [his] custody as she was never harmed or neglected and there was not clear and convincing evidence of a danger to the child necessitating her removal."[13]  We reject the first argument out of hand because " '[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' " (*I.J.*, *supra*, 56 Cal.4th at p. 773; § 361, subds. (c)(1) & (c)(4) [permitting a

---

[13] Justin R. does not argue that even if there is substantial evidence he poses a substantial risk to S.R., DCFS nonetheless failed to establish there is no reasonable means by which she may be protected without removing her from his physical custody.

23

court to remove a dependent child from a parent's custody if there is "a *substantial danger* to the physical or emotional well-being of the minor" or "[t]he minor . . . is deemed to be at *substantial risk* of being sexually abused[ ] by a parent," italics added].)

As further discussed below, Justin R.'s second argument fails because, construing all reasonable inferences in favor of the juvenile court's ruling, the record contains substantial evidence of a substantial risk of great harm, even if the probability of that risk was low, that Justin R. would sexually abuse S.R. if she were in his custody.[14] (See *I.J.*, *supra*, 56 Cal.4th at p. 778.) Such evidence consists of the nature and circumstances of Justin R.'s offense, his lack of insight regarding his behavior, and aspects of Dr. Malinek's report and testimony that are consistent with the

---

[14] Justin R. argues section 361, subdivision (c) required DCFS to show that he poses an "imminent" or "immediate" danger to S.R. None of the decisions he cites holds that this provision includes such a requirement. (See *Santosky v. Kramer* (1982) 455 U.S. 745, 747, 768–770 [invalidating a New York statute that authorized the state to terminate the rights of a parent if only a " 'fair preponderance of the evidence,' " and not clear and convincing evidence, establishes that the child has been " 'permanently neglected' "]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171 [holding that, "under section 361[,] a minor can be removed from a parent's custody only in extreme cases of parental abuse or neglect"]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 821, 823 [noting, in passing, that the consultant's report for the Assembly Committee on Human Services stated that certain statutory revisions would ensure that " '[t]he decision to remove a child . . . and/or terminate parental rights would be based on the immediate danger *or "substantial risk" of danger* to the child,' " italics added].)

24

conclusion that there was a risk that Justin R. would perpetrate a hands-on offense against S.R. were she in his custody.

## I.     The Nature and Circumstances of Justin R.'s Offense

Several days before the hearing, Justin R. suffered a felony conviction for a violation of Penal Code section 311.11, subdivision (c)(1). Penal Code section 311.11, subdivision (c)(1) provides in pertinent part: "Each person who commits a violation of subdivision (a) shall be punished [with imprisonment and/or a particular fine] if one of the following factors exists: [¶] . . . The matter contains more than 600 images that violate subdivision (a), and the matter contains 10 or more images involving a prepubescent minor or a minor who has not attained 12 years of age." (See Pen. Code, § 311.11, subd. (c)(1).) In turn, subdivision (a) of that statute prohibits any person from "knowingly possess[ing] or control[ling] any matter, representation of information, data, or image, including, but not limited to, any . . . computer-generated image that contains or incorporates in any manner, any film or filmstrip, the production of which involves the use of a person under 18 years of age, knowing that the matter depicts a person under 18 years of age personally engaging in or simulating sexual conduct, as defined in subdivision (d) of Section 311.4 . . . ."[15] (See Pen. Code, § 311.11, subd. (a).)

_____

[15] Penal Code section 311.4, subdivision (d)(1) defines " 'sexual conduct' " as "any of the following, whether actual or simulated: sexual intercourse, oral copulation, anal intercourse, anal oral copulation, masturbation, bestiality, sexual sadism, sexual masochism, penetration of the vagina or rectum by any object in a lewd or lascivious manner, exhibition of the genitals or pubic or rectal area for the purpose of sexual stimulation of the

25

The contents and titles of certain videos and images found on Justin R.'s devices indicate that he desired to have sexual relations with girls his daughter's age. For instance, the follow-up investigation report indicates that Justin R.'s external hard drive contained images of "young female children under the age of 12 years old engaging in various sex acts with adults[ ] as well as posing in the nude." More importantly, the title of one of the files downloaded onto the external hard drive was "pedo-11 yo fucks daddy," which suggests that Justin R. did fantasize about having sex with his own daughter. The arrest report also indicates that Justin R. uploaded onto Tumblr a video depicting a nude prepubescent girl being molested by an adult male.

Furthermore, Dr. Crespo opined that Justin R.'s possession of child pornography evidences an "active" or "generalized sexual interest in children."[16] Similarly, although Dr. Malinek

viewer, any lewd or lascivious sexual act as defined in Section 288, or excretory functions performed in a lewd or lascivious manner, whether or not any of the above conduct is performed alone or between members of the same or opposite sex or between humans and animals." (Pen. Code, § 311.4, subd. (d)(1).)

[16] Justin R. argues Dr. Crespo was not credible because he did not interview Justin R., the doctor "cited only . . . an irrelevant and debunked academic article" in his opinion letter, and he "wasn't much of an expert." The juvenile court apparently did not rely upon Dr. Crespo's "statistical analysis" because the court was "not sure" whether it was accurate. Nonetheless, the juvenile court was entitled to rely on other aspects of Dr. Crespo's letter opinion and testimony. (See *I.J.*, *supra*, 56 Cal.4th at p. 773 [" ' "[W]e note that[, when reviewing the record for substantial evidence,] issues of fact and credibility are the province of the trial court" ' "].)

"doubt[ed]" that Justin R. was "pedophiliclly [*sic*] inclined," the doctor noted that one of Justin R.'s therapists stated: "[Justin R.] acknowledged an extreme addiction to pornography, which eventually involved *being sexually aroused by images of minor children.*" (Italics added.) Additionally, Dr. Malinek classified Justin R. as a fantasy-driven offender, thereby acknowledging that Justin R. derived "*sexual gratification*" from "child pornography." (Italics added.)

The juvenile dependency statutory scheme authorized the lower court not only to conclude that Justin R. has a sexual interest in young girls like S.R., but also to draw the reasonable inference that he poses a substantial risk of harm to his own daughter.

Section 355.1, subdivision (d) provides that a parent's conviction for "sexual abuse as defined in Section 11165.1 of the Penal Code . . . shall be prima facie evidence . . . that the subject minor . . . is at substantial risk of abuse or neglect." (See § 355.1, subd. (d).) Penal Code section 11165.1 provides in relevant part that a person commits " 'sexual abuse' " if he or she "knowingly develops, duplicates, prints, downloads, streams, accesses through any electronic or digital media, or exchanges, a film, photograph, videotape, video recording, negative, or slide in which a child is engaged in an act of obscene sexual conduct . . . ."[17] (See Pen. Code, § 11165.1, subd. (c)(3).)

---

[17] "[Penal Code] section 11165.1's reference to 'obscene' acts or conduct is surplusage[,] . . . which we may safely disregard. . . . [D]epictions of . . . children engaged in 'sexual conduct' as defined in Penal Code section 311.4, subdivision (d)(1)—regardless of whether or not [they are] obscene [fall within the scope of Penal Code section 11165.1,

27

Justin R. suffered a conviction for sexual abuse for the purposes of Penal Code section 11165.1 and section 355.1, subdivision (d) because the police reports establish that he downloaded and accessed images depicting children engaged in sexual conduct.

Admittedly, section 355.1, subdivision (d)'s evidentiary presumption does not apply to this case. That provision creates "a presumption affecting the burden of producing evidence." (See § 355.1, subd. (d).) Justin R. rebutted that presumption by offering evidence tending to show that he did not pose a substantial risk of harm to his daughter (e.g., Dr. Malinek's opinion that Justin R. was not "a risk to his daughter"). (See *Quentin*, *supra*, 230 Cal.App.4th at p. 615, fn. 6 ["[Section 355.1, subdivision (d)'s presumption] disappears once contrary evidence is introduced whether or not the contrary evidence is sufficient under the appropriate standard of proof to disprove the presumed fact"].)

Even without the benefit of the presumption, however, the juvenile court was entitled to consider "the fact of [Justin R.'s] prior sex abuse conviction and any reasonable inferences to be derived from it." (See *Quentin*, *supra*, 230 Cal.App.4th at p. 620; see also *id.* at pp. 614–615 ["Once rebutted, the presumed fact may still be considered by the fact finder, as well as any reasonable inferences to be derived therefrom [citation], but without regard to the benefit of the presumption [affecting the burden of producing evidence]"].) Section 355.1, subdivision (d) reflects a legislative judgment that the juvenile court may reasonably infer from Justin R.'s conviction that there is a risk

subdivision (c)]." (See *In re Ulysses D.* (2004) 121 Cal.App.4th 1092, 1098.)

that he may sexually abuse S.R.  (See *In re P.A.* (2006) 144 Cal.App.4th 1339, 1347 (*P.A.*) [holding that even if section 355.1, subdivision (d)'s presumption is "not triggered" in a particular case, "it nonetheless evinces a legislative determination" that a child may be exposed to a substantial risk of harm if the circumstances enumerated under that provision are deemed to exist]; see also *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 222 Cal.App.4th 149, 160 (*Los Angeles County Dept.*) ["An uncodified section of the bill adding this presumption explains the Legislature's intent:  'The Legislature finds that children of the State of California are placed at risk when permitted contact with a parent or caretaker who has committed a sex crime' "].)

In sum, the nature and circumstances of Justin R.'s offense indicate that on the date of the disposition hearing, his daughter was in substantial danger of being subjected to a hands-on offense.

## II.    Justin R.'s Lack of Insight Regarding His Behavior

Justin R. initially told police that he did not even have a Tumblr account and that, outside of his prior employment as a police officer, he did not view child pornography.  He later admitted to Dr. Malinek that he had a Tumblr account, but refused to take full responsibility for his possession of child pornography (i.e., by claiming that "child pornography 'slipped in there with the shock stuff by accident' ").  His subsequent conviction for possession of more than 600 images of children engaged in sexual conduct establishes beyond a reasonable doubt that the representations he made to the police and Dr. Malinek were false.  (See Pen. Code, § 311.11, subds. (a) & (c).)  Although

Justin R. essentially pleaded guilty to this charge,[18] Justin R.'s own expert admitted Justin R. still "*has a way to go* in *developing some insight* about his coping mechanisms [and] in understanding the reason he has turned to and became addicted to pornography in the first place." (Italics added.)

Furthermore, the criminal court ordered Justin R. to complete "52[-]week sex offender counseling" and "participate in weekly individual counseling for 1 year." Dr. Malinek admitted that Justin R. needed to complete these programs to "manage the risk" that Justin R. would "re-offend[ ]," and that Justin R. had not done so by the time of the disposition hearing.

For these reasons, the juvenile court could have reasonably found that at the time of the disposition hearing, Justin R. had not yet acquired the insight needed to avoid engaging in behavior that put S.R. at risk of being sexually abused. (Cf. *Los Angeles County Dept.*, *supra*, 222 Cal.App.4th at p. 161–162, 164 [holding that "father['s] . . . minimiz[ing] the seriousness of his prior sex crimes and [his] fail[ure] to obtain any form of treatment for sex abuse" weighed in favor of finding he posed a substantial risk of sexually abusing his son].)

## III. Dr. Malinek's Report and Testimony

" 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [I]n order to determine whether a risk is substantial, the court must consider both the likelihood that

---

[18] "The legal effect of . . . a plea [of nolo contendere], to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes." (See Pen. Code, § 1016, subd. 3.)

harm will occur and the magnitude of the potential harm . . . .' " (*I.J.*, *supra*, 56 Cal.4th at p. 778.)

Dr. Malinek stated in his report that he "doubt[s] that [Justin R.'s] values comport with abusing children," and that Justin R. "is certainly a 'fantasy driven' and not a 'contact driven' offender." At the hearing, Dr. Malinek insisted that "the vast majority of individuals who are possessing child pornography and do not have other criminal histories[ ] are not likely to target a child for a hands-on offense, not cross to molesting children." The expert further testified that, in his opinion, Justin R. was not "a risk to his daughter."

Yet, other aspects of Dr. Malinek's report and his testimony are consistent with the conclusion that Justin R. poses at least some risk of sexually abusing S.R. Dr. Malinek stated in his report that Justin R.'s "expected recidivism rate" under the CPORT model is "five percent in five years." (Boldface omitted.) The doctor testified that Justin R.'s score "put him in a group of people where the vast majority, *95 or 96 [percent]*, do not re-offend." (Italics added.) Further, when the doctor was asked for further clarification on the meaning of the term "recidivism" in the studies he relied upon, Dr. Malinek indicated that several of them used that term to refer to the commission of "a new hands-on sexual offense." Dr. Malinek also admitted that the studies he utilized did not differentiate between subjects who had "completed rehabilitation" and those who had not, allowing for the possibility that Justin R.'s risk of committing a hands-on offense against S.R. is higher than five percent in five years. The juvenile court was permitted to credit these aspects of Dr. Malinek's report and testimony and not others. (See *P.A.*, *supra*, 144 Cal.App.4th at p. 1344 [" '[A]ll conflicts are to be

31

resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact' "].)

On this record, we find substantial evidence that at the time of the disposition hearing, there was a cognizable and unmitigated, but arguably low, probability that Justin R. would perpetrate a hands-on offense against S.R. if he had unmonitored contact with her. In addition, the juvenile court correctly found that "being involved in child pornography or some other hands-on sexual abuse is a great, great danger to the child and would do her extreme harm." (See also *I.J.*, *supra*, 56 Cal.4th at p. 778 [" '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody"].) It follows that the juvenile court did not err in removing S.R. from Justin R.'s physical custody on the ground that, "even though the likelihood that [Justin R.] will do something to her physically . . . may be small, the risk of harm is great." (Cf. *Los Angeles County Dept.*, *supra*, 222 Cal.App.4th at p. 164 [holding that a low likelihood that a father would sodomize his son constituted a substantial risk of harm].)

## DISPOSITION

The juvenile court's dispositional order is affirmed.


BENDIX, J.

We concur:


CHANEY, Acting P. J.


WHITE, J.*

---

Filed 4/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | B300214<br>(Los Angeles County<br>Super. Ct. No. 19CCJP02321) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>JUSTIN R.,<br><br>      Defendant and Appellant. | ORDER MODIFYING OPINION; CERTIFICATION AND ORDER FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed March 30, 2020 is modified as follows:

1.      By striking the phrase "—no matter how low the probability—" from the second to last sentence of the first full paragraph on page 3.

The opinion in the above-entitled matter filed March 30, 2020, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion as modified above should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

<u>CERTIFIED FOR PUBLICATION.</u>

_____

CHANEY, Acting P. J.          BENDIX, J.          WHITE, J.*

---

\*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2