Filed 12/30/13 (unmodified opn. follows)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>D.S., et al.,<br><br>    Real Parties in Interest. | No. B250059<br><br>(L.A. Super. Ct. No. CK95882)<br><br><br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on December 17, 2013, and certified for publication, be modified in the following particulars:

On the title page, Ailene Wong, Deputy County Counsel, was inadvertently omitted appearing on behalf of petitioner. The first full paragraph is deleted and replaced with the following:

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jessica Paulson-Duffy, Senior Associate County Counsel, and Aileen Wong, Deputy County Counsel, for Petitioner.

There is no change in the judgment.

_____

MOSK, Acting P. J.                                          KRIEGLER, J.

Filed 12/17/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>D.S., et al.,<br><br>        Real Parties in Interest. | No. B250059<br><br>(L.A. Super. Ct. No. CK95882) |

        ORIGINAL PROCEEDINGS; petition for writ of mandate.  Marguerite Downing, Judge.  Writ granted.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica Paulson-Duffy, Senior Associate County Counsel, for Petitioner.

        No appearance for Real Party in Interest.

        No appearance for Respondent.

_____

The Department of Children and Family Services (Department) seeks a writ of mandate to reverse respondent court's order dismissing a petition filed under Welfare and Institutions Code section 300, subdivisions (b) and (d).[1]  Respondent court dismissed the petition, finding that a two-year-old male, S.G., was not at substantial risk of sexual abuse by S.G., Sr. (father), even though father was convicted of sexually assaulting young boys on two separate occasions, was civilly committed as a sexually violent predator (SVP) for almost 13 years after his 7-year prison term, and discontinued any sex offender treatment after his release in 2009.  We conclude the record does not contain substantial evidence to overcome the presumption of jurisdiction set forth in section 355.1, subdivision (d).  The Department's petition is therefore granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Father's 1986 and 1989 Sex Crimes*

In 1986, father pled guilty to violating Penal Code section 288, committing lewd and lascivious acts with a minor under 14.  According to the police report, father sodomized a ten-year-old boy on June 5, 1986.  The crime took place at an elementary school, and the victim claimed father grabbed the victim around his neck, choking him, and kept him from screaming by placing his hand over the victim's mouth.  Afterwards, father told the victim "You better not tell anybody or I'll kill you."  The victim reported the incident to his grandmother, who notified police.  A medical exam confirmed signs of sexual assault.  Police questioned father, and he admitted to sodomizing the victim.  Nothing in the police report mentions any other suspects or participants.

Father again sodomized a young boy in January 1989 while on probation for his earlier sex crime.  Father was 20 years old and his victim was six years old.  Father lured

---

[1]  All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

the victim to his bedroom with a promise of toys, and after sodomizing the child, father gave the victim a Twinkie and told him not to tell anyone because father would get in trouble. The victim reported the incident to his mother, and a medical examination revealed a small tear on the top of his anus, which "was good evidence that the victim had been the victim of a recent sexual assault." When questioned by police, father again admitted the crime and also disclosed that he had been arrested two years earlier for a similar crime. He was convicted of violating Penal Code section 288 and subdivision (c) of Penal Code section 286 (sodomy of person under 14 years with a 10-year age difference). Father served seven years in prison.

### *Father's Civil Commitment as an SVP*

Father was clinically evaluated during his prison sentence to determine whether he qualified as an SVP under sections 6600 et seq. The evaluating psychologist, Dr. Gary Zinik, Ph.D., opined father was sexually attracted to males and also suffered from polysubstance abuse for cocaine, alcohol, marijuana, and PCP (phencyclidine). Dr. Zinik noted alcohol and drugs made it easier for father to act without conscience on his sexual impulses toward children. The doctor further observed that a widely accepted psychiatric reference guide explained that pedophilia "is usually chronic especially those attracted to males. The recidivism rate for individuals with pedophilia involving a preference for males is roughly twice that for those who prefer females." Father's "offense record shows that he clearly fits this profile." The district attorney petitioned for father to be civilly committed as an SVP in June 1996 and again in December 1999. Father was evaluated by mental health professionals who concluded that he suffered from a diagnosed mental disorder, and as a result of the disorder is "predisposed to the commission of sexual acts to such a degree that he constitutes a menace to the health and safety of others." Although the disposition of the 1996 petition is not in the record, a jury found the 1999 petition true, and in December 1999, father was civilly committed as an SVP.

Father was held in state mental hospitals for nearly 13 years and was subject to numerous psychological evaluations during that time. The record at trial included 24 psychological evaluations between April 26, 1996, and February 9, 2009. Until 2005, the evaluators consistently concluded that father was likely to commit sexually violent offenses in the future. Father was not willing to enroll in the second phase of a four-phase treatment program for sexual offenders because he did not consider himself a child molester. In a January 2003 evaluation with Dr. Dawn Starr, Ph.D., father stated his plans after release would be to move in with his mother in Alabama and care for her, then get a job and move in with his girlfriend, register as a sex offender, continue with Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings, and continue his Muslim beliefs. He said he did not participate in sex offender treatment because he considered it a waste of time. He identified alcohol, drugs, and having too much spare time as potential risks. A report by Dr. Douglas Korpi, Ph.D., in the same time frame states father "has consistently informed all who have asked that he does not suffer a sexual disorder, is not a child molester and does not require treatment. He has been quite frank about this: If he is released he will not seek treatment."

For the first time in a report dated March 5, 2005, Dr. Starr concluded father was no longer likely to commit sexually violent crimes in the future. Dr. Starr's conclusion was based on the fact that father planned to seek therapy with Jan Brown, a sex therapist, when he returned to Alabama and appeared committed to sobriety and a socially acceptable lifestyle. Dr. Starr reiterated her concern about father's likelihood of future sexual offending and recognized that without a court order, father's participation in treatment would be voluntary. She believed, however, with the support of his family, father would stay committed to therapy. Given father's new commitment to therapy, Dr. Starr concluded father was not likely to commit future sexually violent offenses.

Dr. Gary Zinik evaluated father in the same time frame and concluded that father remained a danger to others, was likely to commit sexually violent crimes in the future due to a mental disorder, and continued to meet the criteria of an SVP. Dr. Zinik recognized that father had quit smoking, attended anger management and interpersonal

5

skill classes, and regularly participated in Muslim religious activities. Father seemed sincere about his Muslim religious practices and hoped his religion would keep him from reoffending. Dr. Zinick noted father had stopped attending NA/AA meetings eight months earlier. Father identified himself as a sex offender and admitted he needed sex offender and substance abuse treatment, but refused to participate in the hospital's sex offender treatment program because he did not believe he had a mental disorder. Dr. Zinik was aware of father's plans to seek therapy from Jan Brown after his release, but considered this plan insufficient because the proposed group therapy sessions met only once every two weeks. In Dr. Zinik's opinion, father needed intensive sex offender treatment and his history of refusing treatment lowered the chances he would stay in treatment. Dr. Zinik notes: "[Father's] motivation for sex offender treatment is questionable, since he has refused sex offender treatment at [the state hospital] for the past six years. . . . If he were to [be released], he would not be under any supervision. He would be accountable to no one and there would be no way to ensure that he would get the treatment he needs to reduce the risk to reoffend."

Father began the second phase of a five-phase treatment program for sex offenders in early 2008. When asked what motivated him to begin the second phase after almost 10 years of civil commitment, he explained that he did not like the way the program was run at Atascadero State Hospital, but that the program at Coalinga was different. Specifically, the treatment contract at Atascadero required him to admit he had a "problem," but the contract at Coalinga made no mention of such a requirement. Later in 2008, he prepared a "Release Plan" detailing the steps he planned to follow to make a successful transition back into the community when released. Father stated that upon his release, he would leave California to reside with his mother and 24-year-old nephew in Alabama. The "Release Plan" stated father understood the responsibility of being accountable. He planned to follow all sex offender registration laws, keep a daily journal, set up daily "check-in call times" so that his support group knows his whereabouts at all times, and practice full disclosure with employers, landlords, neighbors, and members of the NA group he planned to attend.

Psychological evaluations in 2007 and 2008 reached varying conclusions about father's likelihood to commit future sex crimes. Those psychologists who concluded father no longer met the criteria for SVPs emphasized father's attendance at NA/AA programs, his Muslim faith, and his recognition of the need for continued treatment. Evaluators responded positively to the fact that father was attending treatment and appeared committed to continuing treatment after his release. They continued to diagnose father as suffering from mental disorders, including pedophilia and drug and alcohol dependence. At least one psychologist diagnosed him as having pedophilia, drug and alcohol dependence, and antisocial personality disorder but concluded that because the norms for a psychological test called the Static-99 had changed since 1995, father's predicted risk level had fallen so he no longer met the criteria for an SVP.

### Father's 2009 Release From Civil Commitment

On April 22, 2009, the court denied the district attorney's petition to recommit father as an SVP. It also granted district attorney's motion to dismiss earlier recommitment petitions dated September 23, 2005 and October 19, 2007, and ordered father released forthwith. Nothing in the record or the briefs provides any reason why the district attorney moved to dismiss the 2005 and 2007 petitions, or whether the court considered the possibility of imposing conditions on father's release. A social worker interviewed the district attorney, who recalled the doctors and father all agreed that father needed to continue to participate in ongoing, community-based treatment for sex offenders after his release. The district attorney claimed father was in denial about his issues, and she did not trust father with any child.

7

*Department Investigations of Possible Risk to Children Living with Father*

Less than eight months after his release, father moved in with D.S. (mother) and her three-year-old daughter, Do.S.[2] In November 2009, the Department investigated a report that father, a convicted pedophile, was residing with mother and Do.S. When the Department informed mother of father's criminal history, mother separated from father in order to protect Do.S., and the Department closed the matter without filing a petition. At some point thereafter, mother reunited with father and became pregnant. S.G., a male and the subject of the current petition, was born in June 2011.

The Department received another referral concerning mother and father on September 19, 2012. The caller reported mother and father smoked marijuana around S.G., and father was a registered sex offender. The Department conducted an investigation, interviewing mother, father, and a maternal uncle who occasionally resided with mother. Father admitted his criminal history and denied he was subject to any conditions as a registered sex offender. Father stated he lived with his sister in Los Angeles but spent the night at mother's apartment three to five nights a week because mother works nights. A Long Beach Police Officer was present at the initial visit and advised father that he would need to register in Long Beach even if he maintained a separate residence in Los Angeles. Father agreed to do so. Father also admitted he smoked marijuana and drank beer on occasion.

Mother is slightly developmentally disabled. She told the investigating social worker she knew about father's criminal history but was unaware of what type of child abuse father went to prison for. She explained "that is his past and I know him now." The investigating social worker asked father to describe his past convictions to mother in the social worker's presence. Father began by reminding mother that he had been molested by his cousin as a child. He explained that the 1986 arrest stemmed from the fact that he was present while his cousin was molesting another child and denied

---

[2] Do.S. no longer resides with mother and father and is not a subject of the petition.

participating in the molestation. He admitted he was arrested for sodomy in 1989. Mother did not know what sodomy was and father had to explain it to her. The Department report from its 2009 investigation reflected mother was similarly confused about father's past but had eventually agreed to separate from father in order to avoid the Department's involvement.

In different interviews with the Department, father repeatedly minimized the significance of his earlier sex crimes, his diagnosis as a pedophile, and his designation as an SVP. On September 20, 2102, father denied participating in the molestation that led to his arrest in 1996, attributing the molestation to his cousin. Father said he had received sex offender treatment at the state hospitals from 1996 to 2009, but he did not need professional support after his release. On October 3, 2012, father took the position that it was unfair of the Department to take his earlier crimes into consideration, because he had already served his time and been to treatment. When told the severity of his earlier sex crimes was a cause for significant concern, father responded "it's not like it seems." Regarding his mental health diagnoses, he claimed that while he was at the state hospital, he was classified as "anti-social" but that was only while he was incarcerated. Father emphasized that since his release, he had not been involved with law enforcement and respected the law. On November 9, 2012, father claimed he had changed and no longer was the person who had committed the crimes. He said he completed sex abuse classes while in the hospital. Father said he would not hurt S.G. and repeatedly insisted he needed unmonitored visits. In a May 2013 interview, father said he did not remember if he went to therapy when he first got out of the hospital in 2009. Father denied being diagnosed with a mental illness and said he was not eligible for disability because he did not suffer from any mental disorder.

Father's statements also demonstrate that after he was released from civil commitment in 2009, he did not continue the rehabilitative activities that led to his release. Rather than continuing to attend NA/AA meetings as planned, he was drinking beer and smoking marijuana while living with mother. His release plan emphasized the importance of complying with sex offender registration requirements, yet while the

dependency investigation and case was proceeding, father failed to register as required. A February 15, 2013 police report stated father was to register as an SVP every 90 days, and his last 90-day period expired on June 5, 2012, without father registering. On October 3, 2012, a Los Angeles police officer conducted a compliance check at father's residence, and he was not home. The officer left his card and requested father contact the officer. As of February 14, 2013, father had not contacted the officer or registered.

Father also did not follow through on his plan to marry D.M., the woman he identified as his fiance during his civil commitment. He became romantically involved with mother instead. D.M. is mother's aunt and raised mother from childhood. Father stated he believed D.M. called in the 2009 referral because she was upset that father and mother had formed a romantic relationship.

*Dependency Court Proceedings*

The Department filed a petition on October 9, 2012, alleging that father is a registered sex offender and has a criminal history of sex abuse convictions for sodomy with a minor under 14 years old. The petition further alleged that mother was aware of father's criminal history and failed to protect the child by allowing father to reside in the home with unlimited access to the child. The Department alleged these facts placed the child "at risk of physical harm, damage, danger, sexual abuse, and failure to protect."

Respondent court held a detention hearing, found father to be a presumed father, found a prima facie case, and released the child to both parents. The Department petitioned for a stay of the court's order and authority to re-detain S.G., which we granted on October 11, 2012. Respondent court amended its order, granting father monitored visits only, in accordance with the directions provided by this court.

On January 4, 2013, respondent court ruled that all evaluations of father ordered by a court or the Department of Corrections were discoverable and not privileged, but other physician and psychological records were privileged and not discoverable. The court ordered evaluations from father's civil commitment proceedings produced.

10

*Expert's Report*

On May 26, 2013, Dr. Barry Hirsch completed a report evaluating the risk father presented of sexually molesting his son. He prepared the report under contract with the Department but did not interview father or mother because they both declined to be interviewed. Dr. Hirsch is a psychologist with 43 years of experience working with sexual offenders and 38 years experience as a forensic psychological evaluator. Dr. Hirsch reviewed father's criminal history, Department reports, and father's mental health evaluations and concluded that father presented a serious and well-founded risk of sexually grooming S.G. Sexual grooming consists of planning and deliberate behaviors to befriend and establish an emotional connection with a child to have the child lower and abandon whatever inhibitions the child might have against inappropriate sexual activities. The risk of sexual grooming therefore creates a risk that father will molest S.G. at some point. In Dr. Hirsch's opinion, father would wait until the court was no longer focused upon him, his son, and mother before beginning to groom and sexually molest his son.

Dr. Hirsch based his opinion on a number of facts. Father had resisted sexual offender treatment until everyone told him that if he obtained treatment he would be released. The state hospital had a sex offender treatment program that typically takes four years to complete. Father had only participated in a little over a year in phase two of the program. Father presented a treatment plan to attend out-patient treatment for his sexually deviant interest, attend local NA/AA meetings, and settle down with his fiance, D.M. Once released, however, father repudiated any need for continued sex offender treatment, never attended NA/AA meetings, and abandoned his plans to marry D.M. Instead, he began using marijuana and drinking beer, both identified "triggers" for predatory acts. Father moved in with and impregnated mother, who demonstrated such a lack of insight into the nature of his prior crimes that she reconciled with him after learning of his status as a registered sex offender, had a child with him, and trusted him to care for their son alone overnight. In addition, father failed to register as a sex offender after the Department filed a petition asking the court to exercise dependency jurisdiction

11

based on his criminal history and former status as an SVP.  Father sought to introduce expert testimony through a telephonic or video appearance, but the court denied his motion.

On June 13, 2013, respondent court held a jurisdictional hearing, admitting numerous reports and evaluations, and taking testimony from Dr. Hirsch.  The Department also sought to question father, but father asserted a right against self-incrimination under the Fifth Amendment of the United States Constitution and was not required to take the stand.

On July 17, 2013, respondent court dismissed the section 300 petition, finding no substantial risk was proven to support jurisdiction over S.G.  The Department filed the petition for extraordinary relief and sought a stay of respondent court's dismissal.  Minor's counsel submitted a "preliminary opposition."  This court granted the stay and issued an alternative writ.

Respondent court failed to comply with our writ, which directed it to reverse its order denying jurisdiction and to enter a new jurisdictional order over S.G.  Instead of entering a new jurisdictional order as directed, the court set an adjudication hearing on the now-dismissed petition for December 19, 2013.  Neither respondent nor any real party in interest filed a return.  This court heard oral argument on the petition on November 4, 2013.

## DISCUSSION

We note preliminarily that respondent court and real parties in interest have admitted the allegations in the petition because no party filed a return to our alternative writ.  In response to an order to show cause, real parties in interest may file "a return by demurrer, verified answer, or both."  (Cal. Rules of Court, rule 8.487(b)(1).)  "In the absence of a true return, all well-pleaded and verified allegations of the writ petition are accepted as true."  (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1084.)  Nonetheless, we permitted counsel for father and for the minor to appear at

12

oral argument. After considering the petition, the submitted exhibits, and oral argument, we conclude respondent court erred in dismissing the petition.

## *Standard of Review*

We review respondent court's order for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]" (*Ibid.*) "However, substantial evidence is not synonymous with *any* evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' [Citation.] 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

## *Dependency Law in the Context of Sex Crimes*

A child falls within the jurisdiction of the dependency court when there is "a substantial risk that the child will suffer[] serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child" or if "there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent . . . ." (§ 300, subds. (b), (d).)

Penal Code section 11165.1 provides an extensive definition of sexual abuse, including "[t]he intentional touching of the genitals or intimate parts . . . of a child . . . for purposes of sexual arousal or gratification . . . ." (*Id.*, subd. (b)(4).) The definition of sexual abuse also includes conduct in violation of Penal Code sections 286 ("an act of

sodomy with another person who is under 14 years of age and more than 10 years younger" than the perpetrator) and 288 ("any lewd or lascivious act . . . upon or with the body . . . of a child who is under the age of 14"). (*Id.*, § 11165.1, subd. (a).)

The Department must show by a preponderance of the evidence that a minor is a child described by one of the subdivisions in section 300. (§ 355, subd. (a).) If, however, a parent has been convicted of sexual abuse—even for an offense that occurred many years earlier with an unrelated child—that conviction is prima facie evidence that the parent's own child is a person described by subdivision (a), (b), (c), or (d) of section 300 and is at substantial risk of abuse or neglect. (§ 355.1, subd. (d)(1); see also *In re E.B.* (2010) 184 Cal.App.4th 568, 577.) A parent's status as a registered sex offender also provides prima facie evidence that a child is at substantial risk of abuse or neglect. (§ 355.1, subd. (d)(4).) The burden of producing evidence then shifts to the offender, rather than the Department. (*Id.*, subd. (d).) In establishing this presumption of risk, the Legislature sought to "focus on the heightened risk facing minors who come into contact with sex offenders and to ensure the juvenile court has information about such persons when assessing jurisdictional facts." (*In re John S.* (2001) 88 Ca1.App.4th 1140, 1145.) An uncodified section of the bill adding this presumption explains the Legislature's intent: "The Legislature finds that children of the State of California are placed at risk when permitted contact with a parent or caretaker who has committed a sex crime. Further, the Legislature finds that children subject to juvenile court dependency jurisdiction based on allegations of molestation are in need of protection from those persons. Therefore, the purpose of [section 355.1] is to ensure that information regarding those acts is appropriately considered by the juvenile court in determining whether a child is in need of juvenile court dependency protection." (Stats. 1999, ch. 417, § 1.)

*Law Governing SVPs*

Section 6600, subdivision (a)(1), defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a

14

diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." Statutes permit the state to "civilly commit individuals found to be SVPs" after the end of their prison terms. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646.) Before civil commitment, two mental health experts conduct a full evaluation of the prisoner according to a standardized assessment protocol, which must "require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c); see also *Reilly*, *supra*, at pp. 646-647.) Two experts must concur the individual meets the criteria for commitment in order for a petition of commitment to be filed. Because the civil commitment of an SVP is premised upon a *current* mental disorder, evaluations may be updated or replaced. However, "the updated evaluations' primary purpose is evidentiary or informational. [Citation.] Mandatory dismissal is *not* required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment." (*Reilly*, *supra*, at p. 648, italics added.)

### *Respondent Court's Dismissal is Not Supported By Substantial Evidence*

The Department presented evidence defendant had committed egregious sex crimes against two different boys in separate instances. Father served a lengthy prison term, followed by extended commitments as an SVP. Father minimized his conduct claiming a cousin committed the first sex crime, and he was no longer the same person. Father failed to comply with requirements to update his registration as a sex offender, at least during the period from June 4, 2012, through February 14, 2013. The Department's expert witness, Dr. Hirsch, gave uncontradicted testimony that father presented a serious risk of "grooming" S.G., which placed the child at risk of sexual molestation.

15

Father failed to overcome the presumption under section 355.1, subdivision (d), that his prior convictions and status as a registered sex offender are prima facie evidence to support dependency jurisdiction. He presented no evidence at all. He called no witnesses, offered no documentary evidence, and refused to testify after invoking the Fifth Amendment.

Against this overwhelming weight of the statutory presumption and the Department's evidence, respondent court focused on the facts that father's sex crimes occurred almost 25 years earlier, father had been unconditionally released from his commitment as an SVP, the Department presented no evidence of a current substance abuse problem, and there were no signs father was molesting S.G. When considered in light of the record as a whole, these facts are insufficient to overcome the presumption that S.G. was at substantial risk of abuse or neglect.

The length of time that had passed since father's earlier sex crimes, taken alone, is not enough to overcome the presumption. (See, e.g., *In re John S.* (2001) 88 Cal.App.4th 1140 [affirming jurisdictional finding based on stepfather's status as a registered sex offender for a crime committed 13 years earlier, when stepfather offered no evidence to overcome the presumption].) The weight given to the passage of time is even less substantial considering that father had been in confinement, with no access to potential child victims, for 20 years after his most recent crime.

Respondent court found Dr. Hirsch's 2013 report and testimony were outweighed by psychological evaluations from between 2005 and 2008 that concluded father no longer met the criteria for an SVP. The court recognized that Dr. Hirsch and the state hospital psychologists reached different conclusions about father's risk of committing future sex crimes but found the state hospital psychologists had the opportunity to see father's evolution over a substantial period of time. According to the court, "His doctors at both facilities interviewed him, not once, but on numerous occasions. They wrote numerous opinions on his behavior and they were in a better position to note whether he has made growth or not." It is certainly within the court's province to weigh the relative credibility of the psychological evidence, but the issue before the court is the current risk

16

to S.G., which is not the same issue addressed by evaluators in 2005 and 2008, when father was seeking release from his civil commitment as an SVP. At the time of the earlier evaluations, father was held under his commitment as an SVP and did not have access to young children. Moreover, the premise of the favorable reports was the evaluators' express reliance on father's commitment to continuing sex offender therapy after release, his belief in the Muslim faith, and father's participation in NA/AA meetings. By 2013, father had not engaged in any post-release therapy and denied the need to do so. He was drinking, using marijuana, and had abandoned the Muslim faith. Thus, the expectations that had tipped the scale in father's favor in the eyes of the evaluators before release had not come to fruition. Father presented no evidence the evaluators would not consider him to be a threat in light of his post-release abandonment of the goals he had expressed in seeking release. Most significantly, father presented no evidence that frequent, unmonitored access to S.G. did not place the child at substantial risk of sexual abuse.

Respondent court also relied on father's release from civil commitment as evidence rebutting a presumption of risk. However, the record contains no evidence explaining why father was released. The April 22, 2009 minute order dismissing the district attorney's petition to recommit father as an SVP is silent on the court's reasons for dismissal. The minute order alone, without any detail about the proceeding, does not provide factual support for the court's conclusion that father no longer poses a risk of sexual abuse. The minute order also does not reveal whether the court ever considered, much less rejected, the possibility of imposing conditions on release. In fact, the only other evidence on the absence of conditions on father's 2009 release is a statement from the district attorney, who recalled that father had committed to participate in ongoing community-based treatment and all the doctors had agreed continuing treatment was needed.

Respondent court's finding that the Department did not provide evidence of substance *abuse* mischaracterizes the nature of the potential harm to S.G. the Department was seeking to prevent. The Department did not allege the risk of harm to S.G. arose from father's dependency on drugs or alcohol, as is typical when a case is filed under

subdivision (b) of section 300, based on a parent's history of substance abuse. (See, e.g., *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1653-1654 [affirming jurisdictional finding under § 300, subd. (b), based on substance abuse and mental illness].) Rather, the evidence of such use is relevant to a finding of risk because it demonstrates that father lacks the structure and insight to refrain from behaviors and patterns that led to earlier violent sex crimes against young boys. The court erred in ignoring evidence such as drug and alcohol use because such evidence is relevant to the current risk posed by father.

Respondent court also focused on the fact that the Department had not produced any evidence that father had abused S.G. to date. Although actual abuse can be a basis for exercising jurisdiction, it is by no means requisite when there is evidence of substantial risk, as there is here. (See, § 300.2 [purpose of exercising jurisdiction is to ensure the "safety, protection, and physical and emotional well-being of children who are *at risk of* [physical, sexual, or emotional] harm"].) "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In *In re I.J.*, the California Supreme Court held that a court could find substantial risk to the male siblings of a female child who had been sexually abused by her father, even in the absence of any evidence that the father had physically or sexually abused the male siblings. In determining whether substantial risk exists in a particular case, courts consider not only the probability that a given harm will occur, but also the severity of the harm. "[T]he more severe the type of [] abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*Id.* at p. 778.) While it is not possible to say what a particular sexual predator "is likely to do in the future in any particular instance[,]" it is that uncertainty that "makes it virtually incumbent upon the juvenile court to take jurisdiction" over others at risk. (*Id.* at p. 779.)

Here, both the probability and the severity of the possible sexual abuse is high enough to require a finding of substantial risk. Father was civilly committed as an SVP until less than two years before S.G.'s birth. Father had scored four points on a

18

psychological test called the Static-99.  Father argued that his score corresponded to only a 4.8 to a 17.9 percent likelihood of reoffending.  Dr. Starr points out "that the estimate provided by the Static-99 reveals only the probability he will be *convicted* of a new sex crime, not the likelihood that he would actually commit another illegal sexual act."  Even if the score accurately captures the likelihood that father will reoffend, the nature of his earlier crimes are violent enough to compel the exercise of dependency jurisdiction on this record.  In addition, the score is based on testing done before father was released from the state hospital and therefore does not account for father's later activities.  In addition, Dr. Zinik noted pedophilia is "usually chronic" when directed at males.

Respondent court's findings are insufficient, as a matter of law, to overcome the presumption of section 355.1, subdivision (d).  Twenty-seven years ago, father sodomized a ten-year-old boy, and then repeated the same crime with a six-year-old boy two years later.  He served seven years in state prison, and then was civilly committed for thirteen years as an SVP.  No matter how well-intentioned father may have been at the time he obtained his release in 2009, for the past four years, father has minimized the seriousness of his prior sex crimes and failed to obtain any form of treatment for sex abuse or drug or alcohol dependency.  He states he does not have a problem and wants unmonitored access to his two-year-old son.  The court's determination that father had overcome the presumption of jurisdiction is not supported by substantial evidence.

19

## DISPOSITION

For the foregoing reasons, the Department's petition is granted and a writ of mandate hereby issues directing respondent court to vacate its order of July 17, 2013, and issue a new order finding S.G. is a person described in section 300, subdivisions (b) and (d).

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

KUMAR, J.*

---

\*     Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.