Filed 1/12/24  In re Miah C. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MIAH C., a Person Coming Under the Juvenile Court Law. | B322847 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HELIO R.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 22CCJP02284A) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa Brackelmanns, Juvenile Court Referee. Affirmed in part and dismissed in part.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Helio R., father of 10-year-old Miah C., appeals from the juvenile court's jurisdiction findings and disposition order declaring Miah a dependent child of the court and removing her from his custody and care. Helio argues substantial evidence did not support the juvenile court's findings, based in large part on Miah's statements Helio tickled her "private parts" while playing games with her, that he sexually abused Miah. Helio similarly contends substantial evidence did not support the removal order at disposition. We conclude that substantial evidence supported the jurisdiction findings and that Helio's appeal from the disposition order is moot. Therefore, we affirm the jurisdiction findings and dismiss the appeal from the disposition order.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Miah's Mother Suspects and Asks Miah Whether Helio Abused Her*

Miah lives with her mother, Yareth C.; Helio lives in a separate residence. In 2020 Helio began regularly picking up Miah from school in the afternoon and dropping her off at Yareth's workplace.

One day in April 2022, when Miah was eight years old, Miah complained to Yareth that her "private parts" were hurting.

Yareth noticed the skin around Miah's genital area was irritated and began asking Miah whether Helio had touched her. Miah was initially defensive and denied Helio had done anything. At one point Yareth asked Miah to "swear to God" that her father had not touched her vaginal area, and Miah responded she did not want to swear to God because she did not want God to punish her. Eventually Yareth held and rocked Miah "like a baby" and, rather than asking her whether Helio had done anything, asked Miah if she did not want to be alone with Helio. Miah said she did not. Yareth again started asking Miah what Helio had done, and Miah eventually said he "tickles" her leg.

Yareth sent Helio a text message accusing him of touching Miah inappropriately. Helio denied the allegation, called Yareth a "psycho," and accused Yareth of putting words in Miah's mouth. Helio stopped picking up Miah from school.

B.      *Miah Tells a School Nurse, Police Officers, and a Social Worker That Helio Touched Her Private Parts*

A week later, Miah told a nurse at her school "something really sad happened to [her]." Miah said her father would tickle her while playing a game called "horsey," and she pointed to her genital area to show where he would tickle her. Miah also said her father would open her legs without permission.

That afternoon, two officers with the Los Angeles Police Department interviewed Miah at her home. Miah told the officers that, one day while her father was driving her home from school, he reached over from his seat, put his hand over her underwear, and started tickling her "vagina." Miah also stated that, since she was about four, her father had touched her "private part" while tickling her.

3

Later that evening, a social worker for the Department interviewed Miah. Miah told the social worker that, when her father would tickle her, he would tickle her in the "wrong places." When asked to explain, Miah said her father would tickle her arms, feet, and legs while she was lying on the bed, but would also "play peekaboo" by opening her legs and tickling her "private parts." Miah told the social worker she did not realize what her father was doing was wrong. She stated she did not want to tell her mother because she was afraid she would no longer be able to see her father.

Miah also described for the social worker an incident at a water park. While sliding down a slide with her father, Miah felt his finger touch her genital area, underneath her clothing. Miah initially told her father she was going to tell her mother, but Helio said it was an accident. Miah told the social worker that her father had not touched her private parts under her clothing any other time.

C.    *Helio Denies the Allegations*

The social worker interviewed Helio, who denied abusing Miah. According to Helio, Yareth was sexually abused when she was young, which caused her to be distrustful and assume Helio was abusing Miah.[1] Helio described an incident that occurred when Miah was four years old. Helio took Miah on a ride at a theme park that scared and "traumatized" her. That night, when Miah was at home with Yareth, Miah started crying. Yareth assumed Miah was crying because Helio abused her but, in

---

[1]    Yareth also told the social worker that she was sexually abused as a child and that she regularly told Miah no one was supposed to touch her private parts.

Helio's view, Miah was crying because she had a nightmare about the ride.

When asked about the incident at the water park, Helio confirmed Miah had accused him of touching her private parts while they went down a water slide. Helio told Miah that he did not do it or that it was an accident. Helio denied to the social worker that he touched Miah underneath her swimsuit and said that his hands, at most, would have grazed Miah's legs.

### D. *Miah Sits for a Forensic Interview*

A few weeks later, a specialist at a child advocacy center conducted a forensic interview of Miah. Miah's statements about Helio were similar, but not identical, to her prior statements. Miah told the interviewer that her father did things with his hands that, according to Miah, "weren't really inappropriate." She recounted a time when she was lying down, and her father "opened [her] legs and he used them like . . . doing a peek-a-boo." Miah said that she "thought that something was weird because that's not normally whatever happens" and that she felt her father's beard on her inner thigh. She stated her father had been opening and closing her legs in that way since she was four years old.

At another point in the interview, Miah told the interviewer that her father would tickle "very close" to her private parts.[2] Miah demonstrated by placing her hand on the table in front of her and telling the interviewer to pretend her hand was her private part and the surface of the table on each

---

[2] Miah told the interviewer that her "private parts" referred to her "vagina," but that her mother did not allow her to use that word.

5

side of her hand was her legs. With her other hand, Miah then imitated a walking motion with her index and middle fingers and walked her hand on the top of the table (i.e., her "legs") and over her hand (i.e., her "private part"). However, when the interviewer asked Miah, "Did your dad ever actually touch your private part when he was tickling you," Miah responded: "No. I don't know at least. I don't know."

Miah also described during the interview the "horsey" game. Miah would sit on her father's lap, her father would shake his leg and foot, and Miah would "pretend like [she] was going somewhere on a horse." When asked by the interviewer, "What about horsey was a bad thing," Miah responded, "My mom told me that he could have done something with a part of my body, and it could have been wrong. . . . I don't really know if that was true that he was touching my private parts. . . . I have no idea if that was true, but my mom says that it could have been."

E.     *Miah Recants Some of Her Statements*

A week after Miah's forensic interview, the Department's social worker interviewed Miah again. This time Miah stated that her father never touched her private parts and that she was confused when she had accused him of doing that. Miah explained she thought her father may have touched her private parts because her mother had asked whether he did so and told her "those things were bad."

Miah acknowledged that her father would tickle her, but she pointed to her thighs and abdomen (rather than her genital area) to show where. Miah also said her father would do the "walking thing" with his hand while he was driving. Miah demonstrated (as she had during the forensic interview) by

6

imitating a walking motion with her fingers, and she "walked" her hand from one of her thighs, over her genital area, to the other thigh. After seeing Miah's demonstration, the social worker asked Miah whether her father would walk his fingers directly over her genital area as she had demonstrated. Miah said, "no."

In her written report, the social worker stated: "During this interview," Miah "seemed genuinely confused as to the allegations and reported being so. . . . [W]hile she did think father had touched her inappropriately based on what mother had explained to her was appropriate and not appropriate, upon analyzing the matter further, she did not think father had done anything inappropriate to her."

      F.    *The Department Files a Petition Against Helio, and the Juvenile Court Denies the Department's Request To Detain Miah*

The Department filed a petition under Welfare and Institutions Code section 300, subdivisions (b) and (d),[3] alleging that Helio "sexually abused" Miah by "fond[ling]" her "vagina, thighs, and lower abdomen" and that such abuse put Miah "at risk of serious physical harm, . . . danger and sexual abuse."

At the initial hearing, the juvenile court denied the Department's request to detain Miah from Helio. The court found that, while the Department made a prima facie showing Miah was a person described by section 300, there were "concerns by the forensic social worker and the [police] investigator that the child may have taken cues from mother's aggressive

---

[3]    Undesignated statutory references are to this code.

7

questioning."[4]  The court further found that there were reasonable services available to prevent removal and that continued custody by both parents would not be detrimental to Miah.

G.     *The Department Interviews Miah and Helio Again*

An investigator for the Department interviewed Miah again after the detention hearing.  This time Miah stated:  "I'm still trying to learn what good and bad touch is.  He's never touched me in my private places."  Miah went on to say that, when her mother had asked whether her father touched her, she told her mother he did not.  However, her mother eventually convinced her that her father had touched her inappropriately.  Miah stated:  "I'm not saying that she (mother) brainwashed me, but she made it sound convincing.  It has happened to her (mother) before and she was scared."  Miah also said:  "I didn't want to get my dad in trouble.  I was just thinking what she [her mother] was thinking.  I believe her more than I believe myself."

Miah again stated her father would tickle her legs and arms.  She first told the investigator he tickled her about "once a month," but then said "not that much" and not much on her legs.  When asked whether her father played "peekaboo," Miah said:  "He would open my legs like peekaboo, but I was always wearing clothes.  We were just playing a game.  It was nothing intentional.  It didn't mean nothing."

---

[4]     A social worker for the Department and a Los Angeles Police Department officer attended Miah's forensic interview.  Both observed that, during the interview, Miah appeared to be using language coming from her mother.

8

When asked about her previous statement her father touched her in the "wrong places," Miah said she meant "[a]round [her] private part, but not on top of [her] private part." When asked about the incident at the water park, this time Miah said she did not remember anything happening at a water park, though she did remember a time her father caught her at the bottom of a slide and she landed on her father's hand. Miah told her father, "I'm going to tell my mom." However, Miah explained: "It was a joke. I know he didn't do it on purpose. I forgot to tell my mom. It was an accident."

The investigator noted in her report Miah "*made some conflicting statements and appeared to be protective of her father.*" According to the investigator, "[i]t appear[ed] that [Miah] wanted to stress . . . that father had not done anything wrong, and that she had been influenced by mother . . . ."

The investigator also interviewed Helio, who again denied he had abused Miah and blamed Yareth for "pressur[ing] her to say those things." Helio stated said that he used to play "horsey" with Miah when she was three years old by placing her on his back, but that he no longer did that. He also said he used to play peekaboo with Miah when she was two or three years old, but demonstrated (the more traditional version) by placing his hands in front of his face.

## H. *The Juvenile Court Declares Miah a Dependent Child of the Court and Removes Her from Helio*

At the combined jurisdiction and disposition hearing, the juvenile court sustained each count of the petition and declared Miah a dependent child of the court. The court stated that "these cases are not easy," but found that Miah had, "at various times, described . . . what amounts to sexual abuse." The court also found that the "horsey" and leg peekaboo games, and Helio's tickling of Mia's "vulva area," were red flags. The court removed Miah from Helio, allowed Helio to have nine hours of monitored visits each week, and ordered him to participate in sexual abuse counseling for perpetrators and individual counseling.

Helio timely appealed from the jurisdiction findings and disposition order. While this appeal was pending, the court terminated its jurisdiction and issued a custody and visitation order under section 362.4 granting Yareth sole physical custody of Miah[5]; granting Yareth and Helio joint legal custody of Miah; and ordering the same nine hours of monitored visits each week for Helio.[6] In awarding Yareth custody of Miah, the court found

---

[5] "When terminating its jurisdiction over a child who has been declared a dependent child of the court, section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order') that will become part of the relevant family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513.)

[6] In its disposition order the court had ordered Helio to participate in individual counseling and sexual abuse treatment. The court based the custody and visitation order, at least in part, on the finding Helio had not made substantial progress toward completing the counseling or treatment.

Helio had not made substantial progress toward completion of the court-ordered counseling. Helio also appealed from the custody and visitation order.

## DISCUSSION

A. *Helio's Appeal from the Jurisdiction Findings Is Not Moot, but His Appeal from the Disposition Order Is*

In juvenile dependency proceedings, an appeal "becomes moot when events "'render[ ] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief."'" (*In re D.P.* (2023) 14 Cal.5th 266, 276; accord, *In re Gael C.* (2023) 96 Cal.App.5th 220, 264; *In re Damian L.* (2023) 90 Cal.App.5th 357, 369.) "An order terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot." (*In re Rashad D.* (2021) 63 Cal.App.5th 156, 164; see *In re G.Z.* (2022) 85 Cal.App.5th 857, 874; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) However, "when a juvenile court's finding forms the basis for an order that continues to impact a parent's rights—for instance, by restricting visitation or custody—that jurisdictional finding remains subject to challenge, even if the juvenile court has terminated its jurisdiction. [Citations.] Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*D.P.*, at pp. 276-277; see *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432; *In re A.R.* (2009) 170 Cal.App.4th 733, 740.)

Helio argues, the Department does not dispute, and we agree his appeal from the jurisdiction findings is not moot. The

11

jurisdiction findings were the bases of the custody and visitation order that gave Yareth sole physical custody of Miah and required Helio's visits with Miah to be monitored.  Because Helio has appealed from the juvenile court's order terminating its jurisdiction and the custody and visitation order, we can grant Helio effective relief if he prevails in this appeal.  (See *In re Gael C.*, *supra*, 96 Cal.App.5th at p. 225 ["'in most cases . . . for this court to be able to provide effective relief, the parent must appeal not only from the jurisdiction finding and disposition order but also from the orders terminating jurisdiction and modifying the parent's prior custody status'"]; *In re Rashad D.*, *supra*, 63 Cal.App.5th at p. 164 ["to the extent an appellant argues, as here, that the challenged jurisdiction finding resulted in an adverse juvenile custody order . . ., an appeal from the orders terminating jurisdiction and awarding custody is necessary"].)

In contrast, Helio's appeal from the disposition order removing Miah from his care is moot.  Unlike the jurisdiction findings, the removal order was not a basis for the court's custody and visitation order.  To the contrary, the court awarded Yareth physical custody of Miah and required Helio's visits with Miah to be monitored because Helio failed to make substantial progress toward completing the case plan the court had ordered—in particular, by failing to participate in sexual abuse and individual counseling.[7]  Thus, reversing the disposition order removing Miah from Helio's care would not provide Helio any effective relief; he would still be bound by the custody and visitation order.

_____

[7]     Aside from challenging the jurisdiction findings, Helio does not challenge the portion of the disposition order requiring him to participate in counseling.

12

Nor was removal at disposition required for the court to issue a custody and visitation order that awarded Yareth physical custody of Miah and required Helio's visits with his daughter to be monitored. "[A]t the disposition stage of a dependency proceeding, a court may not remove a child from a parent's custody . . . unless the court finds there is a substantial danger to the child and no available services to protect the child absent removal." (*In re T.S.* (2020) 52 Cal.App.5th 503, 515; see § 361, subd. (d).)[8] That standard, however, does not "apply to custody and visitation determinations made at a section 364 review hearing concurrent with the termination of juvenile court jurisdiction." (*In re J.M.* (2023) 89 Cal.App.5th 95, 113; see *T.S.*, at p. 515 ["There is no statutory language . . . suggesting this standard be applied when the court issues a custody order upon the termination of jurisdiction pursuant to section 364."].) Instead, the court "'has broad discretion to make custody [and visitation] orders when it terminates jurisdiction'" (*J.M.*, at p. 112), and "'the court's focus and primary consideration'" is "'the best interests of the child.'" (*T.S.*, at p. 513; see *J.M.*, at p. 113 ["Section 362.4 does not require a finding of detriment under any

_____

8      Section 361, subdivision (d), provides: "A dependent child shall not be taken from the physical custody of his or her parents, . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent, . . . to live with the child or otherwise exercise the parent's . . . physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child" from the parent.

13

circumstances; as a result, courts have applied the best interest standard in determining appropriate custody and visitation exit orders at this stage."].)  To obtain reversal of the custody and visitation order, Helio will have to show, in his later appeal from that order, the juvenile court abused its discretion because the order was not in Miah's best interests.  (See *J.M.*, at pp. 112-113; *In re M.R.* (2017) 7 Cal.App.5th 886, 902; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

B.  *Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings Under Section 300, Subdivision (d)*

1.  *Applicable Law and Standard of Review*

Section 300, subdivision (d), provides the juvenile court may adjudge a child a dependent of the court if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent . . . ."  As relevant here, sexual abuse includes "[t]he intentional touching" of the child's "genitals or intimate parts, including the . . . genital area, groin, inner thighs . . . or the clothing covering them, . . . for purposes of sexual arousal or gratification . . . ."  (Pen. Code, § 11165.1, subd. (b)(4); see *In re Mariah T.* (2008) 159 Cal.App.4th 428, 439.)

"In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings . . . we 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.'  [Citations.]  'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'"  (*In re*

14

*L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re J.S.* (2021) 62 Cal.App.5th 678, 685.)  In reviewing for substantial evidence, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640; see *In re Nathan E* (2021) 61 Cal.App.5th 114, 122 ["'In making [a substantial evidence] determination . . . we note that issues of fact and credibility are the province of the trial court.'"].)  "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings . . . ." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; see *J.S.*, at p. 685.)

### 2. *Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings*

Helio contends substantial evidence did not support the court's jurisdiction findings.  While the evidence was not overwhelming, there was substantial evidence supporting the court's finding under section 300, subdivision (d), that Helio sexually abused Miah or that there was a substantial risk he would do so in the future.

After returning from Helio's care and complaining to Yareth that her private parts were hurting, Yareth noticed Miah's genital area was irritated, and Miah told Yareth that she did not want to be alone with her father.  One week later, Miah told the school nurse, police officers, and a social worker that her father had tickled her private parts or "vagina."  During her subsequent forensic interview, Miah again stated her father did things with his hands, such as tickling "very close" to her private parts; indicated by using her hands to demonstrate how Helio ticked her that he actually touched her genital area; and said

15

Helio had opened her legs to place his face near her private parts. The court could reasonably infer based on Miah's statements that Helio intentionally touched Miah's "genital area, groin, [and] inner thighs" for sexual arousal or gratification (Pen. Code, § 11165.1, subd. (b)(4)) and that he would do so again in the future. (See *In re Carlos T.* (2009) 174 Cal.App.4th 795, 804 [substantial evidence supported the juvenile court's finding of sexual abuse where the child said his father "'play[ed] with [his] front private part'" multiple times and touched his "'butthole'"]; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344 [substantial evidence supported the juvenile court's jurisdiction findings where, "although [the child's] accounts of [her] father's abuse varied in the details, each account related essentially the same two incidents"].)

True, Miah disclosed the abuse only after persistent questioning from Yareth, and in her last interview Miah recanted some of her allegations. But it was up to the juvenile court to determine which version of events was more credible. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court"]; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 ["an appellate court defers to the trier of fact . . . and has no power . . . to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence"].) Consistency in a child's account of sexual abuse is not required to support a jurisdiction finding. (See *In re I.C.* (2018) 4 Cal.5th 869, 896 ["A child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust."].) It is not enough

16

that a different factfinder may have made a contrary finding. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225 [we "will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists"]; *In re J.N.* (2021) 62 Cal.App.5th 767, 774 ["'we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw'"].)

Moreover, the juvenile court had good reason to believe Miah was telling the truth during her initial disclosures to the school nurse, police officers, and the Department's social worker. By the time Miah recanted her initial allegations, she had a motive to change her story: to protect her father. During her last interview with the Department's investigator, Miah confirmed she did not want to get her father in trouble and "didn't want anything like this to happen." The investigator observed that Miah's conflicting statements appeared to be an effort to protect her father and convince the investigator she had been influenced by her mother.[9]

In addition, there was evidence corroborating Miah's initial allegations. During an interview with the Department's investigator, Yareth described a similar incident that occurred when Miah was four, where Miah's genital area was irritated after returning from a visit with Helio. Miah told Yareth that her father had grabbed her and touched her while at a theme

---

[9]     Yareth also told the investigator that Miah told a child at her school what Helio had done, and the child told Miah her father was going to jail—an additional incentive for Miah to protect Helio.

park—similar to her initial statements her father tickled her private parts.

Yareth also told the investigator that Miah, while visiting Helio, would call her crying and ask Yareth to pick her up, but that Miah did not want to tell Yareth what had happened. The investigator viewed this incident as one of several warning signs that indicated grooming behavior by Helio. Finally, the social worker who initially interviewed Miah concluded that, despite Miah's occasionally inconsistent statements, the social worker believed, "[b]ased on [her] 7 years of experience as a social worker investigating over 500 child abuse referrals," Helio's conduct "was inappropriate and put child Miah's well-being and safety at risk." (See *Casey N. v. County of Orange (*2022) 86 Cal.App.5th 1158, 1176 ["[t]he importance of the social worker's reporting and recommendations in the dependency process cannot be overstated"; the court should "give due consideration to the social worker's determination and the court may properly rely upon the agency's expertise for guidance"]; *In re Brian W.* (1996) 48 Cal.App.4th 429, 433-434 ["The juvenile court may properly rely upon a social worker's report to support a jurisdictional finding under section 300 as long as the opportunity to cross-examine the social worker is provided."].)[10]

There was also substantial evidence supporting the court's implicit finding Helio's statements were not credible. In addition to Helio's strong motive to deny Miah's allegations, Helio's descriptions and explanations of his conduct were not consistent with Miah's description of what happened, even after Miah

---

[10] Helio did not ask, and does not contend he was unable, to cross-examine any of the Department's social workers or investigators.

18

changed her version of the events.  For example, while Miah eventually denied Helio directly touched her private parts, Miah never recanted her allegation she sat on Helio's lap to play "horsey."  Helio, however, denied ever playing the game Miah described, stating he only put Miah on his back.  Similarly, during her final interview with the Department's investigator, Miah continued to say Helio would play peekaboo by opening her legs.  Helio said he had not played peekaboo with Miah since she was a toddler, and even then only placed his hands in front of his face.  And Helio never offered an explanation for why, following the theme park incident and the last time he picked Miah up from school, Miah's genital area was irritated.

Citing *In re I.C.*, *supra*, 4 Cal.5th 869, Helio argues the juvenile court cannot exercise jurisdiction under section 300, subdivision (d), based solely on a child's hearsay statements unless the statements have special indicia of reliability.  Helio is incorrect on the law.  The Supreme Court in *I.C.* stated:  "'[T]here are particular difficulties with proving child sexual abuse: the frequent lack of physical evidence, the limited verbal and cognitive abilities of child victims, the fact that children are often unable or unwilling to act as witnesses because of the intimidation of the courtroom setting and the reluctance to testify against their parents.  [Citation.]  Given these realities, the categorical exclusion of child hearsay . . . will often mean the exclusion of significant, reliable evidence required for the juvenile court to assert its jurisdiction over the child and to ultimately protect him or her from an abusive family relationship.'"  (*I.C.*, at p. 886; see *In re Cindy L.* (1997) 17 Cal.4th 15, 29.)

For these reasons, "the traditional hearsay bar has been modified in the juvenile dependency context to allow courts to

19

consider certain out-of-court statements concerning suspected abuse . . . ." (*In re I.C.*, *supra*, 4 Cal.5th at p. 884.)  In particular, section 355 "'broadly authorize[s] reliance on any hearsay contained in the social study by a child victim under the age of 12, as long as an objecting party does not prove that the statement was procured by means of fraud, deceit, or undue influence.'" (*I.C.*, at p. 885; see *In re Cindy L.*, *supra*, 17 Cal.4th at p. 28, fn. 6.)  Section 355 also "makes clear" such hearsay statements "are sufficient to support a jurisdictional finding." (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1242 (plur. opn. of Mosk, J.)); see *In re E.B.* (2010) 184 Cal.App.4th 568, 577 ["Only '[i]f any party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study' may the specific hearsay evidence 'be [in]sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based.'"], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)[11]

---

[11]    Section 355, subdivision (b), provides:  "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)."  Section 355, subdivision (c)(1), provides:  "If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless.  [¶] . . . [¶]  (B) [t]he hearsay declarant is a minor under 12 years of age who is the subject of the jurisdictional hearing."

*In re I.C.* involved an "unusual situation" where, shortly after a three-year-old child was abused by an older child, the three-year-old child made allegations against her father "strikingly similar" to the abuse incident involving the older child. (*In re I.C.*, *supra*, 4 Cal.5th at p. 896.) The three-year-old child "had a tendency to interweave fantasy with truth" and, during her forensic interview, made several demonstrably false statements after promising to tell the truth. (*Id.* at p. 894.) The Supreme Court held "a juvenile court may not base its findings solely on the hearsay statements of a truth-incompetent child— that is, a child who may not testify because she is too young to separate truth from falsehood—unless the child's statements bear 'special indicia of reliability.'" (*Id.* at p. 875.) Citing the plurality opinion in *In re Lucero L.*, *supra*, 22 Cal.4th 1227, the Supreme Court in *In re I.C.* stated that "'relying too heavily on the hearsay statements of incompetent minors to make jurisdictional findings when there has been no opportunity for cross-examining the minor' [citation]—and, in particular, when the minor 'has been determined to be incompetent to distinguish between truth and falsehood' [citation]—raises a substantial risk of erroneously depriving parents of their substantial interest in maintaining custody of their children." (*I.C.*, at p. 887; see *Lucero L.*, at pp. 1244, 1246 (conc. opn. of Kennard, J.).) Nothing in *In re I.C.*, however, undermines the applicability of section 355 where a minor, like Miah, is old enough, competent, and able to understand the difference between truth and falsehood. Helio does not contend Miah was truth-incompetent. And the record is to the contrary.[12]

_____

[12] At the beginning of the forensic interview, the interviewer asked Miah several questions to test her ability to understand

21

Helio also contends that, even if he may have touched Miah's genital area, the Department "presented absolutely no evidence to support the conclusion that [he] was sexually motivated" when he did it, as required by Penal Code section 11165.1. The record does not support Helio's contention. "Because intent for purposes of [sexual abuse of a child] can seldom be proved by direct evidence, it may be inferred from the circumstances." (*In re Mariah T.*, *supra*, 159 Cal.App.4th at p. 440.)[13] Helio focuses primarily on Miah's description of "horsey," asserting there was no evidence to show it was "anything other than an innocent game." Were the "horsey" game the only evidence supporting the jurisdiction findings, Helio may have a point. But Miah also stated Helio played "peekaboo" by opening her legs and placing his face against her inner thighs

___

and answer questions truthfully. For example, the interviewer asked, "What if I said, hey Miah, how many cats do I have? What would you say?" Miah appropriately answered, "I have no idea." The interviewer also asked Miah "[W]hat if I said, oh Miah, you told me that you're in high school right?" Miah correctly responded, "No, I'm not in high school . . . . I'm in third [grade]." At another point, the interviewer told Miah, "It's also super, super important that what you tell me is the truth," and asked, "Do you promise that you will tell me the truth today?" Miah responded, "Mm-hmm. Yes, I promise."

[13] The court in *In re Mariah T.*, *supra*, 159 Cal.App.4th 428 specifically addressed Penal Code section 288, which makes it a crime to commit any lewd or lascivious act on a child. (See *id.* at pp. 439-440.) Section 288 requires a showing—similar to the showing required under section 11165.1, subdivision (b)(4)—the defendant acted "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." (Pen. Code, § 288, subd. (a).)

or tickling her private parts.  And Miah on multiple occasions did a demonstration of the "walking thing," indicating Helio touched Miah's genital area and upper thighs.  Because there were no innocent explanations for this behavior, the court could reasonably infer Helio was sexually motivated or aroused.  (See *In re R.C.* (2011) 196 Cal.App.4th 741, 750-751 [court could infer sexual arousal or gratification where the adult was "French kissing" the child, because "there can be no innocent or lovingly affectionate tongue kissing of a child by an adult"]; *Mariah T.*, at p. 440 [court could infer sexual intent where the mother's boyfriend, on multiple occasions, "lay down next to [the child] and fondled her thigh up high near her crotch"].)  The latter incidents were evidence that, when Helio put Miah in his lap during the "horsey" game, it was not so innocent.

In any event, the court did not have to find Helio had already sexually abused Miah—i.e., he already had derived sexual gratification or arousal from his conduct.  Under section 300, subdivision (d), the court only had to find there was "a substantial risk" Helio would sexually abuse Miah.  (See *In re I.J.* (2013) 56 Cal.4th 766, 773 ["section 300 does not require that a child actually be abused," only "a 'substantial risk' that the child will be abused"].)  Given that Helio touched Miah's genital area on multiple occasions with no justification, the court could reasonably infer Helio was likely to progress to more serious acts of abuse from which he would derive sexual gratification.  (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 222 Cal.App.4th 149, 164 ["While it is not possible to say what a particular sexual predator "'is likely to do in the future in any particular instance,'" it is that uncertainty that "'makes it virtually incumbent upon the juvenile court to

23

take jurisdiction'" over others at risk"]; see also *I.J.*, at p. 773 ["'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'"]; *In re M.D.* (2023) 93 Cal.App.5th 836, 848 [same].)[14]

## DISPOSITION

The juvenile court's jurisdiction findings are affirmed. Helio's appeal from the disposition order is dismissed.

SEGAL, Acting P. J.

We concur:

FEUER, J.

MARTINEZ, J.

---

[14] Because we affirm the jurisdiction findings under section 300 subdivision (d), we do not consider whether substantial evidence also supported the jurisdiction findings under section 300, subdivision (b). (See *In re D.P.*, *supra*, 14 Cal.5th at p. 283 ["'"[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"'"]; *In re I.J.*, *supra*, 56 Cal.4th at p. 773 [same]; *In re J.N.*, *supra*, 62 Cal.App.5th at p. 774 [same].)